## Case No. 9,501.

### The METROPOLIS.

[Betts' Scr. Bk. 694.]

District Court, S. D. New York. June, 1862.

COLLISION—PASSENGER STEAMER—LOOKOUT — OBLIGATION TO CARRY LIGHTS—DEFENSE—VESSEL LOST WITHOUT LICENSE.

[1. It is no defense to a libel for a loss by collision that the vessel lost was engaged in the coasting business without any license as required by law.]

[2. It is inexcusable negligence for a large passenger steamer navigating Long Island Sound at night not to have a lookout other than the pilot in the pilot house.]

[3. The absence of a lookout forward on a large steamer navigating Long Island Sound on a moonlight night at great speed will be held to have contributed to a collision with a small propeller, which should have been seen by a competent and diligent lookout in time to have avoided the collision.]

[4. Local inspectors cannot release a vessel from the obligation to carry colored lights as provided by law.]

[5. The fact that a steam propeller sunk in a collision did not carry her mast light at a proper elevation, and carried no colored lights, as required by law, will not prevent a recovery where the colliding vessel, travelling at great speed on a moonlight night, had no lookout, and her pilot

would not have seen the colored lights had they been carried, did not see the bow light. and in fact saw the mast light in ample season to have avoided a collision.]

[This was a libel by The New London Transportation Company, owners of the steam propeller J. N. Harris, against the steamboat Metropolis and William Brown, master, for collision. The Bay State Steamboat Company appeared as claimants.]

E. C. Benedict, W. R. Beebe, and W. Q. Morton, for libellants.

F. B. Cutting, for claimants.

SHIPMAN, District Judge. This suit is instituted by the libellants, owners of the steam propeller J. N. Harris, to recover damages suffered by the latter in a collision with the steamboat Metropolis, owned by the claimants. It appears from the proofs taken in the case that the two boats, at the time of the collision, were running regularly through Long Island Sound; the Harris between New York and New London, and the Metropolis between New York and Fall River. The Harris was a small vessel, a little over two hundred tons burthen, and of power proportionate to her size. Her business was principally the transportation of freight, though she carries some passengers, and had several on board at the time of the accident, which has given rise to the present controversy. The Metropolis belonged to the largest class of sidewheel passenger steamers, and was capable of moving with great speed and power. At the time of the collision the vessels were pursuing opposite courses, the Harris being bound from New York to New London, and the Metropolis from Fall River to New York. They met and collided in the open Sound, a few miles to the south, and eastward of New Haven Light, the Harris having passed it about an hour before. Both boats were moving at the time of the collision, the Harris very slowly, and the Metropolis at a high rate of speed. The latter struck the Harris about twelve feet forward of her pilot house, cutting her nearly in two, and sinking her almost instantly. The owners of the Harris have filed this libel, and are seeking to recover for the injuries suffered by their boat. The disaster was a very serious one, involving a considerable loss of life, as well as large damage to property. But the only question presented for our consideration on the merits of the case is that which relates to the cause of the collision.

The claimants have raised a question of a preliminary character, which if it prevails, must operate as a complete bar to the suit. It is proper, therefore, to consider it before we proceed to the other points of the controversy. This point is founded on the alleged non-compliance of the Harris with the regulations of the coasting-trade, and the equipment of steamers as prescribed by the several acts of congress relating thereto. The second sec-

tion of the act of July 7, 1838 [5 Stat. 304], "An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam,"—provides, "that it shall not be lawful for the owner, master or captain of any steamboat or vessel propelled in whole or in part by steam, to transport any goods, wares and merchandise, or passengers, in or upon the bays, lakes, rivers, or other navigable waters of the United States, * * * without having obtained from the proper officer a license under the existing laws, and without having complied with the conditions of this act." The act fixes a penalty of five hundred dollars for every violation of this provision. The license referred to in the act cited is conceded to be the coasting license provided for by the act of February 18, 1793 [1 Stat. 305], and which is to be issued by a collector,—in this case by the collector of the port of New London. The act of August 30, 1852 [10 Stat. 61], was an act to amend that of July 7, 1838; and section one provides "that no license, register or enrolment, under the provisions of this act or the act to which this is an amendment, shall be granted, or other papers issued, by any collector, to any vessel propelled in whole or in part by steam, and carrying passengers, until he shall have satisfactory evidence that all the provisions of this act have been fully complied with; and if any such vessel shall be navigated with passengers on board, without complying with the terms of this act, the owners thereof and the vessel itself shall be subject to the penalties contained in the second section of the act to which this is an amendment." This act of August 30, 1852, also provides for the inspection of hulls and boilers of steam vessels, by officers appointed for that purpose, who are to give certificates of such inspection, and of their approval of the equipment of the boats.

The Harris took out her annual coasting license on the 11th of August, 1857, which was, by its terms, to continue in force one year and no longer. The accident occurred on the morning of the 15th of August, 1858, at about 2 o'clock. It is conceded that no new license had been taken out. The claimants insist that the license had expired, and that the Harris was, at the time of the collision, running in violation of law. The libellants contend that by the terms of the 9th section of the act of 1793, the Harris had three days after her return to the district of New London, within which to deliver up her license, she being out of the district when the term for which it was granted expired. and that it was still in force at the date of the collision. On this claim of the libellants I express no opinion, but proceed to consider the point as raised by the claimants. Their argument is that the Harris was at this time engaged in prosecuting an unlawful voyage,—she was carrying freight and passengers without a license and without a certificate in viola-

tion of the statute, and for which she and her owners were liable to heavy penalties, and are therefore not entitled to come into this court or claim damages for injuries received in this collision while she was thus illegally employed. Two cases have been cited as directly supporting this proposition, together with others which are claimed to rest on analogous principles. The first case cited is that of The Maverick [Case No. 9,316], determined by Judge Sprague in the district of Massachusetts. An attentive examination of this case satisfies me that it does not sustain the position assumed by the claimants in the present suit, although some remarks of the learned judge, in his opinion, would seem to favor that view. The libellant in that case was the mate of a brig which had run a warp or line across the track of a ferry in Boston harbor, and the Maverick, a steamboat, ran forcibly against the line, in which the leg of the libellant had become entangled, by which he was seriously injured. The libel was brought to recover damages for this injury, and the defense justified this forcible act by pleading a license to run the ferry. This license the owners of the Maverick held by assignment from the original grantees. The court held that a license to run a ferry, under the statutes of Massachusetts, was not assignable; that the defendants took nothing by the assignment, and that therefore the defence failed. The other case referred to on the argument is that of The Leopard [Id. 8,264], and is very similar to that of The Maverick [supra]. The doctrine of the latter case is cited by Judge Ware in giving his opinion in that of The Leopard; and it must be admitted that he seems to take the same view of its effect as that urged by the learned counsel for the claimants in the case now under consideration; but I do not understand him either to affirm or deny the principle which is inferred he regarded as laid down in the case of The Maverick.

But on this principle, I do not think the doctrine now contended for can be sustained. There is no logical or legal connection between the failure of the Harris to obtain the renewal of her coasting license and the collision which resulted in her destruction. She was not absolutely prohibited from being on Long Island Sound and in the vicinity of the accident, nor is it necessary for her to justify her presence there by showing a license of any kind, although it might have been unlawful for her to have been engaged in the business covered by a coasting license. In the case of The Maverick, it must be remembered that, according to the facts there shown, the warp of the brig was rightfully in the place where it was struck by the steamboat, as against all but ferryboats, and in order to maintain the right to move forcibly against it, any vessel would have been required to justify under an authority resting on a ferry grant, and thus show a right superior to that of the brig. There was no right in com-

mon there. The warp of the steamboat must give way, and the latter could only claim the exclusive right by a justification under a special grant. That justification failed. But in the cases of the Harris and Metropolis, neither had or claimed any exclusive right to navigate Long Island Sound, in the exercise of which it became necessary for one to yield to the other. It was in the attempted exercise of no such right that the disaster occurred. When congress enacted the law requiring steamers to take out a coasting license, and have a certificate of proper equipment, before carrying passengers, fixing penalties for non-compliance, surely it was not intended that the penalty of outlawry should be superadded. This would vastly enhance the dangers of steamboat travel, which it was the object of the act to diminish, and invite collisions by exempting the colliding boat and its officers from the consequences of their carelessness or recklessness. It would have been equally unlawful for the Harris to have had on board gunpowder or other explosive substance, without a special license for that purpose, as provided by the seventh section of the act of 1852, and while a violation of that provision would have subjected her to a penalty, I apprehend that such an omission to comply with the law would hardly be urged as a ground upon which she should be deemed an outlaw on the waters, and her right to any redress for any injuries arising from the negligence of others wholly denied.

The case cited from 10 Metc. (Mass.) 363 (Bosworth v. Inhabitants of Swansey), evidently rested on the local laws of Massachusetts as expounded by her courts. It was a suit at law to recover damages received by the plaintiff while traveling on a defective public highway which the defendants were bound by law to keep in repair. The opinion of the court states the law of Massachusetts to be such, that in order to recover, the plaintiff must prove himself to have been wholly without fault, and that inasmuch as he was, when he received the injury complained of, traveling on the highway on Sunday, in violation of a statute of the state, he must be deemed to be in fault and therefore not entitled to recover. The application of the doctrine of that case to cases of collision would be a novelty in maritime law. The other cases cited by the claimants' counsel on the argument had their inception in contracts prohibited by law, and rest on the well-known principle that courts will lend no support to such contracts nor to any rights growing out of them, and therefore have no bearing on the present question. The preliminary objection to the right of the libellants to a standing in court must therefore be overruled.

We come now to the consideration of the merits of this case, and the only points which I regard as demanding any extended inquiry are those which charge the Harris with being in fault. I have carefully examined the

evidence and considered the able arguments which have been offered to exculpate the Metropolis; and though I am aware that in regard to the comparative degree of care and circumspection required of large passenger steamers when meeting propellers and sailing vessels, the law has been carried to the verge of rigor, still I am satisfied, that under its most liberal interpretation, there is no escape from the conclusion that the Metropolis was in fault on this occasion. She had no lookout. This was an inexcusable neglect in a vessel like her. The law in this respect is well settled, and so familiar that the citation of authorities would be superfluous. It is in vain to urge that the pilot was acting as a lookout. It is admitted that he was in the pilot-house, engaged in directing the navigation of the steamer. He could not, while thus employed, be such a lookout as prudence and safety required, nor such a one as the law, as settled by repeated decisions in both the circuit and supreme courts, requires. The duties of his position as pilot were of the most responsible and exacting character, and, if properly attended to, disqualified him from exercising that single eyed diligence which is demanded from a lookout. The latter should have no other duty to perform, no other employment to distract his attention. He should occupy the most favorable position for scanning the path of his vessel, should be isolated from everything that can divert his mind from the single duty before him, and be wholly relieved from all other anxieties or cares. That the pilot of an immense steamer, moving in the night in a great thoroughfare like Long Island Sound, in a track frequented by other vessels, and at a high rate of speed with all the duties and responsibilities of such a position resting on him, is not such a lookout as I have described, needs no argument to prove. That this collision, with all its disastrous consequences, resulted from the failure of those in charge of the Metropolis to discover the Harris, what she was, and the course she was steering, in season, there can be no doubt; and that the absence of a lookout contributed to the accident is equally clear. Indeed, in view of the clear proof that the weather was clear and the moon two hours high at the time, it is difficult to see why a lookout, if he was attending to his duty, would not have discovered the Harris in ample season to have cleared her, even if she had no light visible. Suppose she had been a sailing vessel in motion, and without lights. What justification would the Metropolis have to present for colliding with her under such circumstances, and when running at such great speed? That the night was sufficiently light to have discovered even a sailing vessel without lights, is evident from the speed of the Metropolis. No pilot would have risked such a boat and the lives of man, passengers by going at such a speed, unless it was light enough to have seen vessels far enough ahead to have cleared them. I therefore think the irresistible conclusion is, that the absence of a lookout on the Metropolis was not only a grave fault, but one which directly contributed to the disaster.

But it is insisted that the Harris was also in fault, in particulars which ought to bar her claim for damages altogether, or at least reduce the amount, under the familiar rule that where both vessels are in fault the damages must be apportioned. Among the faults charged on the Harris, and the only ones I deem it important to dwell upon, are—(1) Want of a good lookout. (2) Improper location of her stern or masthead light. (3) Want of colored side lights. (4) Total absence of a bow light, or at least of one sufficiently bright to have been discovered by the Metropolis in time. It is proper, in this place, to note the leading circumstances under which the steamers approached each other,—the state of the sea, the degree of darkness which prevailed, their rate of speed, and the movements made by each on the discovery of the other. There was nothing in the state of the weather or sea tending to embarrass either vessel, or in any degree to produce the disaster. The night was comparatively calm, and the water tranquil, and both boats were under the perfect control of their navigators. The night, if not very light, was certainly far from dark. The moon was nearly two hours high. There was no fog or mist, or obstruction of any kind to obscure their view of each other. When five miles apart they were approaching each other nearly head and head; the Harris moving through the water at the rate of six or seven, and the Metropolis at the rate of sixteen or seventeen miles an hour. The former was a small propeller of about two hundred tons; the latter, a side-wheel steamer of about 2,000 tons. The pilot of the Harris discovered the Metropolis not far from five miles off, about half a point on his port-bow, and as they were approaching each other nearly head and head, very properly ported his helm to pass to the right. The lights of the Metropolis were distinctly visible when she was first discovered by the pilot of the Harris. Precisely at what distance the pilot of the Metropolis discovered the stern or masthead light of the Harris, is not easy to determine. His testimony on this point is uncertain and very unsatisfactory. The first he saw was this stern light which was fastened to the stay at an elevation of forty or fifty feet from the deck. This light he mistook for a star, and it suddenly disappeared from his view. He is wholly unable, either by an estimate of time or distance, to furnish the court with any means of determining how far off the Harris was at this time, when he first caught a glimpse of her light; but as it was a globe lantern, and according to the evidence was burning brightly at the time, he must, unless his vision was very imperfect, have discovered it when several miles distant; and had he known what she was, and the course she was steering, he could have cleared her with-

out any difficulty. The light very soon re-appeared but how soon he is equally unable to give even an approximate idea. This light, both when it was first discovered and when it re-appeared, bore, the pilot says, about a point or a point and a half on the starboard bow of the Metropolis. When he saw it the second time, he concluded that it was the light of a propeller bound westward, and starboarded his wheel to pass to the left of her. He immediately discovered her sails, and for the first time attempted to check or stop the speed of his boat, and at the same time hove his wheel hard astarboard; but it was too late. She struck the Harris nearly at right angles, cutting far into her, and sinking her almost instantly. At the instant of collision the Harris must have been heading nearly south by east, and the Metropolis about southwest. The pilot of the Harris, when he discovered that the Metropolis had changed her course and was bearing down for the former, ported his wheel again and nearly stopped her before she was struck.

It will at once be seen, from this statement of the position and course of the two boats, from the time the pilot of the Harris discovered the Metropolis, and when, or nearly when, the former ought to have been seen by the pilot of the latter, that there was great negligence somewhere, or the accident would never have happened. That the speed of the Metropolis ought to have been checked at once when the stern light of the Harris was discovered is very certain, especially as the pilot of the former does not pretend he then saw her hull or sails, and therefore could have no knowledge of the direction in which she was moving. It may be said that the collision might still have happened if any effort had been made to stop her; but this is by no means certain. The great difficulty in finding any fact in this part of the case which can excuse the Metropolis, is that her pilot seems wholly oblivious as to time or distance at this fatal point of his voyage. To hold a steamer like her blameless in running without a lookout, and at such a rate of speed after she has discovered a vessel's light in her vicinity and ahead of her, and while her officers are wholly ignorant of the character and course of that vessel, would encourage recklessness and greatly enhance the dangers of navigation.

We now come to consider particularly the charges of fault made against the Harris; and 1. The want of a proper lookout. I think upon this charge the evidence wholly fails, and can come to no other conclusion than that she had a proper lookout and that he was on duty, and remained in his position at the expense of his life.

2. The improper location of the stern or mast-light of the Harris. This may be disposed of in few words. The light was at a proper elevation, was sufficiently bright, was seen by the pilot of the Metropolis, even when he discovered it the second time, far enough off to have enabled him to have cleared her, had he known what she was, and the course she was steering.

3. The third charge is that the Harris did not have the colored lights prescribed by the regulations of the supervising inspectors. This point was elaborately discussed on the argument, but from the view I take of the proofs, I do not feel called upon to dwell upon it here. I do not, however, assent to the position of the libellant's counsel, that if the regulations of the supervising inspectors, requiring propellers to carry side lights, was valid, the Harris was released from all obligation to conform to it by the act of the local inspectors. In my judgment, the local inspectors are clothed with no power to abrogate such a regulation, or to release any particular vessel from obligation to comply with it. For the purposes of this case, I assume the rule requiring these lights to have been valid and binding on the Harris, and I also assume, for the same purpose, as correct, the proposition of the claimants' counsel, that "the burden of proving that the collision was not caused or superinduced by their absence, and that the accident would equally have happened if she had had these lights," is on the libellants. I regard the evidence of the pilot of the Metropolis as conclusive, that if the Harris had had the regulation lights he would have failed to have seen them. He did not discover her bow light at all, and in the view in which I think that light is placed by the evidence, it is hardly possible, failing as he did to see it at any time, that he would have discovered one of these colored lights, if the Harris had had them set. There was no lookout, who with greater vigilance and keener vision, might have discovered both the side and bow lights. If this be a correct view of this point, then the absence of the regulation lights of the Harris had no connection with the causes of the disaster and no injurious consequences can attach to her owners in this suit for that omission.

4. That the Harris had no bow light or at least an insufficient one. From the testimony of Capt. Smith of the Harris and the passengers, Morning and Orr, it is evident that a light was trimmed and placed in the box on the bow, at the proper time. Nor can there be much doubt that this light when so placed there, and for some time after, was sufficient to have enabled the pilot of the Metropolis, or a sufficient lookout, to have discovered her in ample time, to have given her a wide berth. What the condition of that light was during the time the vessels were approaching each other for the last five miles preceding the collision is not so clearly proved, and it is on this point alone that I have felt some doubt as to the conclusion to be drawn from the evidence. The proofs show that the oil with which the lamp was supplied was of good quality, and the evidence of Graves and Flannagan, hands on board the Harris, warrants the conclusion that it was burning tol-

erably brightly at the time of the collision. I think the evidence of Johnson, the watchman on board the Metropolis, tends to confirm their testimony. It is quite evident that the light he discovered, and which he thought at first was light in a schooner's companionway or binnacle, and afterwards supposed it to be in the engine room of the Harris, was the bow light of the latter; and his error is accounted for by the resemblance of the sash in the light box to a window. The failure to sight this light in time to ascertain the course of the Harris must therefore be attributed, not to the feebleness of the light, but to the absence of a proper lookout who could have discovered it.

From this point of the evidence, it follows that the Harris is not chargeable with any fault which contributed to the accident, and for which her owners are to be held responsible in this suit. And in coming to this conclusion, I assume the light produced in court to be the one which the Harris had on her bow, and while I by no means intend to intimate that in my opinion such a light is a sufficient one for a propeller on all occasions, I think it was adequate on the night and under the circumstances of this disaster; and that had there been a proper lookout on board the Metropolis, the Harris would have been seen, and both her lights sighted in season to have cleared her. Indeed, as already remarked, it is difficult, considering that state of the weather and atmosphere which prevailed, to see why a good lookout could not have discovered her sails and hull soon enough to have enabled the Metropolis to have avoided her, and it is more difficult to discover anything in the testimony of the pilot of the Metropolis which would justify the inference that he would have discovered a bow light on the Harris, even if she had had one of the precise character which the claimants insist she should have had.

There were other points raised on the argument, and pressed with great learning and ability, but the conclusions to which I have arrived render our examination of them unnecessary in this place. A decree must be entered for the libellants with an order of reference to ascertain the damages.

During my examination of the voluminous evidence in the case, I have felt a never absent though unavailing regret that the case could not have been decided by the able and lamented judge who presided at the trial when the proofs were taken, and whose comprehensive, exact and luminous judgment would have shed light on every branch of the controversy. The most diligent perusal and comparison of the mass of evidence has doubtless failed to present the facts to my mind with that clearness with which they were revealed during the narrative of the witnesses; and if I have erred in the view which I have taken of the case, that error can be corrected by a higher and more competent tribunal.